December 16, 1991

IN THE SUPREME COURT OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

IN THE MATTER OF THE ) APPEAL NO. 90-037
DISCIPLINE OF ) DISCIPLINARY ACTION NO. 90-01
 )
 JUAN T. LIZAMA, ) OPINION
 )
 Respondent. )
_____)

Argued and submitted May 7, 1991

Counsel for Respondent/Appellant: Reynaldo Yana
 P.O. Box 6529
 Saipan, MP 96950

Counsel for Petitioner/Appellee: Jane Mack
 Micronesian Legal Services
 P.O. Box 826
 Saipan, MP 96950

BEFORE: DELA CRUZ, Chief Justice, VILLAGOMEZ and BORJA, Justices.

VILLAGOMEZ, Justice:

Respondent, Juan T. Lizama, ("Lizama") appeals the trial court decision which found that he:

 1. Violated Rule 1.15, of the ABA Model Rules of Professional Conduct,[1] by placing a client's trust fund

---

 [1] Hereafter, reference to a rule pertains to the ABA Model Rules of Professional Conduct, unless otherwise specified.

in his personal account and commingling it with his own money, without the client's knowledge and consent.

2. Violated Rule 1.7(a) and Rule 2.2 by simultaneously representing himself, Teresita T. Camacho ("Teresita"), and his mother while they had conflicting interests.

3. Violated Rule 1.8(a) by entering into a business transaction with a client, without clearly explaining the nature of the transaction and without advising the client to seek the advice of an independent counsel.

4. Violated Rule 1.8(e) by providing financial assistance to a client in connection with a pending or contemplated litigation.

5. Violated Rule 1.8(f) by receiving fees from his client (administratrix) and a third person (Teresita) in a probate case.

Lizama contends that clear and convincing evidence[2] do not support the factual findings of the trial court, as to each of the above violations found, and that the court erred as a matter of law in concluding that the above rules were violated.

## I.

On January 10, 1990, Teresita submitted to Charles K. Novo-Gradac (chairperson of the disciplinary committee of the CNMI Bar

---

[2] Rule 9(g) of the Disciplinary Rules and Procedure requires proof by clear and convincing evidence.

Association) a letter of complaint against Lizama. Teresita complained that Lizama had taken $9,000.00 of her money, placed it in a trust account, and had refused to return it to her.

The disciplinary committee, through David A. Webber (a committee member), investigated the complaint. Mr. Webber reported his factual findings to Mr. Novo-Gradac by letter dated February 14, 1990. In his letter, Mr. Webber concluded that Lizama had technically violated Rule 1.7 and recommended that he be given a letter of admonishment.

The bar committee reviewed Mr. Webber's report and decided instead to recommend to the Superior Court that it appoint disciplinary counsel to file a formal complaint with the court.

The court appointed attorney Jane Mack, who filed a formal complaint against Lizama on April 9, 1990. Ms. Mack subsequently filed an amended complaint which alleged ten (10) specific violations of the Model Rules.

The matter went to trial in which both parties presented evidence. The trial court concluded that Lizama violated Rules 1.15, 1.7(a) and 2.2, 1.8(a), (e) and (f), and imposed disciplinary sanctions as follows:

> The respondent is suspended from the practice of law for three (3) years, thirty (30) months of which are suspended on the following conditions:
>
> > (a) the respondent take and pass the Multi-State Professional Responsibility Examination within eight (8) months from this date.
> >
> > (b) The respondent pay to Teresita Camacho $2,000 for attorney fees collected on October 14,

1988 and February 3, 1989. This is to be paid within 60 days from this date.

(c) The respondent allow an independent audit of all trust account deposits and withdrawals made within the past three (3) years. The respondent shall be responsible to pay for said audit. The bar association disciplinary counsel shall select the auditor.

(d) The respondent shall pay the costs of this proceeding including attorney fees within 60 days from the date of the billing. This is pursuant to Rule 19 of the Disciplinary Rules.

(e) The respondent not be found in violation of any acts giving grounds for discipline pursuant to Rule 2, Com.R.Disc.Pro.

(f) Although not made mandatory, it is recommended the respondent institute a retainer agreement policy in his office to reflect at a minimum (1) the fact of the representation, (2) legal work to be done, and (3) fee arrangements.

Should respondent fail to comply with conditions (a), (b), (c), (d) and (e), the suspension of the remaining 30 months shall be vacated and respondent shall be suspended from the practice of law for the full three year term.

Since the suspension of the respondent is for a definite term, Rule 16, Com.R.Disc.Pro. will not apply and this court will monitor the conditions imposed herein.

In order to effectively monitor the six month suspension, the respondent shall comply with Rule 15 of the Disciplinary Rules.

Pursuant to Rule 15(c), this order shall be effective 30 days after entry.

We subsequently issued a stay of the above disciplinary sanctions, pending appeal.

## II.

The facts that led to this disciplinary matter are intricate and confusing. The intricacy derives from several subsets of events occurring simultaneously which eventually merged and became intertwined into one complex set of facts. Unless the separate events are carefully viewed separately, they could be misinterpreted.

There are two main sets of facts which are relevant. First, the probate of the estate of Isidro S. Tudela, deceased. Second, Teresita's sale of her share of inherited land to Francisco C. Wabol ("Wabol"). An integral part of the facts include those surrounding the "short-exchange" claim and the sale by Teresita of her share of that claim.

To set forth these events clearly, we shall present the two main sets of facts separately and show how and when they intertwine.

### A. Probate of Tudela's Estate:

Isidro S. Tudela ("Tudela") died intestate on June 17, 1965, on Saipan. At the time of his death, he owned several parcels of land in Saipan. Between 1973 and 1976 Tudela's ten children (including Teresita) and his wife agreed to the partition and distribution of Tudela's land among themselves. They had the various lands surveyed and partitioned. They subsequently executed mutual deeds of conveyance transferring the subdivided lands among themselves in accordance with their agreement.

By virtue of the mutual deeds of conveyance, each individual heir received his/her share of Tudela's land and obtained a certificate of title (from the land commission office) to his/her individual share. (Tr. at 208-209, 215-216)[3] The lands distributed in accordance with the family agreement included Lot E.A. 112, part of which was designated for and transferred to Teresita (Lot E.A. 112"A").[4]

On January 19, 1988, Inocencia T. Apatang ("Inocencia"), one of the ten children of Tudela, filed a petition for letters of administration in order to probate the estate of Tudela. At that time, Inocencia was occupying Tudela's land in Chalan Kanoa (Lot 017 H 44). Such lot apparently was not subject to the mutual deeds of conveyance which distributed Tudela's lands among the heirs.

Inocencia petitioned the court to probate only the lands that had not been distributed mutually among the heirs. The trial court appointed her as administratrix and letters of administration were issued on February 29, 1988. In the inventory of the estate filed on April 15, 1988, she entered only Lot 017 H 44 and a short-exchange claim against the Marianas Public Land Corporation ("MPLC").

The short exchange claim constituted the difference in the amount of land that she claimed the government should have transferred to her father (Tudela) by virtue of a government land

---

[3] "Tr." stands for transcript of the trial and the number represents the page number of the transcript.

[4] See also, the trial court's file in Civil Action No. 88-05P.

exchange (EA 222),[5] but which the government failed to convey. It amounted to approximately 8,095 square meters.[6]

In filing the first inventory of the estate, the administratrix decided not to include Lot E.A. 112 because the heirs had distributed that lot to certain of the heirs, through a mutual deed of conveyance, and believed it was not part of Tudela's estate. (Tr. at 208-209, 215-216)

On May 5, 1988, the administratrix petitioned the trial court for final distribution of the estate. The petition requested that Lot 017 H 44 be distributed to Inocencia (the administratrix)[7] as hers and that the land, to be received from the short-exchange claim, be sold and the proceeds therefrom be equally distributed among the ten heirs.

However, before a final distribution was entered, on September 19, 1988, the administratrix filed an amended inventory, adding to the assets of the estate a war claims award for the sum of

---

[5] See our opinion in Apatang v. MPLC, No. 89-013, 1 N.Mar.I. 36 (1990).

[6] MPLC initially agreed to transfer such land to the heirs, then subsequently decided not to transfer the land unless ordered by the court. Consequently, the heirs, through the administratrix, filed suit against MPLC in Civil Action 89-570. The trial court entered judgment in favor of MPLC and the administratrix appealed to this Court. This Court reversed and instructed that judgment be entered in favor of the heirs. Apatang v. MPLC, No. 89-013, 1 N.Mar.I. 36 (1990). MPLC then transferred the land to the administratrix (which became part of Tudela's probate case) and was distributed in the decree of final distribution.

[7] During the pendency of the probate, Inocencia purchased from the nine other heirs all their interests in Lot 017 H 44 and received deeds from each of them. See trial court's file in Civil Action No. 88-05P.

$2,347.90.[8] On the same day, she amended her petition for final distribution and requested that:

1. Lot 017 H 44 be distributed to the administratrix, Inocencia.

2. That any land received by virtue of the short-exchange claim be sold and the proceeds therefrom be distributed equally among the ten heirs.[9]

3. That the war claims money be equally divided among the ten heirs.

Lot E.A. 112 was still not included in the petition for final distribution of the estate.

On January 25, 1989, the administratrix filed a second amended inventory which added Lot E.A. 112 to the estate.

The reasons for the second amended petition is as follows: First, Teresita, an heir of Tudela, decided to sell her share of Lot E.A. 112 (E.A. 112"A") to Wabol. Second, Wabol would not purchase the land unless title insurance was obtained. Third, the title insurance company would not insure title unless Lot E.A. 112 was probated as part of the estate of Tudela. Thus, Lot E.A. 112 was made a part of the estate to confirm the deeds of conveyance

---

[8] During the pendency of the probate, the war claims award was issued by the government for the heirs of Tudela.

[9] It was at this point that MPLC amicably agreed to transfer such land to the heirs. Subsequently, it changed its position and would not transfer the land to the heirs unless ordered by the court.

and the title in the respective heirs.

On February 3, 1989, the trial court issued a decree of _partial_ distribution, which, among others, confirmed and approved the conveyance of Lot E.A. 112"A" to Teresita under the mutual deed of conveyance. The decree further confirmed the validity of the land exchange between Tudela and Pangelinan with respect to Lot E.A. 112, as was previously determined by the U.S. District Court. It also authorized the administratrix to file suit against MPLC for the short-exchange claim.[10]

On November 6, 1990, the trial court entered a final decree distributing the land received from MPLC for the short-exchange claim (Lot 031 L 05), to the administratrix to sell and distribute the money among the heirs.

B. __Teresita's Sale of Lot E.A. 112"A" to Wabol__:

In August, 1988, Teresita agreed to sell her share of the Papago land (E.A. 112"A") to Wabol. At that time, Teresita was living in Nevada and was told by Charles Novo-Gradac, the attorney for Wabol, that it would take two months to complete the transaction. Two months later she returned to Saipan and on October 11, 1988, went to the office of Mr. Novo-Gradac to close the transaction. Mr. Novo-Gradac told her that the title insurance company found two defects with her title to Lot E.A. 112"A" and

---

[10] At this point, MPLC had decided not to transfer land for the short-exchange claim unless ordered by the court. The administratrix filed a court action which was disposed of in her favor (by this Court) on April 30, 1990. _Apatang v. MPLC_, _supra_, n. 5.

would not insure title unless those defects were removed. Without the title insurance, Wabol would not buy the land.

The news that Wabol would not buy the land depressed and angered Teresita. (Tr. at 11, 62) Her land had been conveyed to her since 1974 by all of the other heirs of Tudela. The land was no longer in her deceased father's name and she had been issued a certificate of title to the land.[11] (Tr. at 216) She had expected to close the transaction, receive the purchase money, and return to Nevada.

The two defects raised by the title insurance company were (1) the questionable validity of the prior exchange involving Lot E.A. 112 between Tudela and Pangelinan because Pangelinan's estate had not been probated, and (2) Lot E.A. 112 was in the name of Tudela, at the time of his death, and his estate had not been probated.

Novo-Gradac advised Teresita to seek legal counsel to correct the defects. Since Teresita knew that Lizama was the attorney in the Tudela probate matter, she went to talk to him about the two defects. Lizama agreed to help Teresita remove those defects for a fee of $1,000.

With respect to the first defect (i.e., the validity of the exchange between Pangelinan and Tudela), Lizama investigated the matter and discovered that the exception raised by the title insurer was baseless. He found that the federal district court had earlier addressed the matter and had declared the exchange to be

---

[11] It was for this reason that this parcel was not initially entered as part of Tudela's estate.

valid. Lizama did not have to take any further action in the Tudela probate case to satisfy the title insurer's concern about the Pangelinan/Tudela exchange. Part of Teresita's agreement to pay Lizama was for that work. As a result of that research work, the insurance company was satisfied.

With respect to the second defect (i.e., the non-inclusion of Lot E.A. 112 in Tudela's estate), Lizama called Novo-Gradac and advised him that he was already handling the probate of Tudela's estate and would include Lot E.A. 112 in the inventory of the estate. Therefore, to correct the defect, Lizama amended the inventory of the estate a second time and included Lot E.A. 112.

Before any of the above work could be done, Teresita found herself in a financial predicament. (Tr. at 78, 226, 313) The removal of the alleged defects would take time. Until then, she could not receive the money she had expected to receive from Wabol (Tr. at 14), and she had to return to Nevada, but had no money for her transportation. (Tr. at 18, 78)

Knowing that her brother, Candido, had earlier sold his interest in the short-exchange claim to Ben Salas for $5,000 and that her sister, Margarita, had agreed to sell her interest in the short-exchange land to Lizama's mother for $10,000, Teresita offered to sell her own share in the short-exchange claim to Lizama for $10,000. (Tr. at 226-227)

Lizama rejected Teresita's offer for ethical reasons. (Tr. 225, 281) Teresita then started crying and begging for help. (Tr. at 226, 313) In response, Lizama told her that he would see what

he could do to help her. He walked outside his office and asked one of his employees, Juan B. Tudela, if he would like to purchase Teresita's interest in the short-exchange claim. After telling him the price of the land, Juan B. Tudela replied that he did not have $10,000. Lizama then called his mother and told her about Teresita's offer to sell her land interest. It was then decided that Teresita's expectancy would be purchased. However, Lizama claims that there was an understanding with Teresita that upon selling her Papago land to Wabol, she would return the $10,000 and take back her expectancy. (Tr. at 230-290)

On October 14, 1988, Lizama drafted two documents (an assignment of expectancy and a deed) for Teresita's signature, transferring her short exchange expectancy to Lizama's mother for the consideration of $10,000. Lizama had previously prepared similar documents for Candido and had also prepared a set for Margarita. Both Teresita and Margarita executed their documents at the same time and each received $10,000, except that Margarita paid Lizama $1,000, out of her $10,000, for Teresita's attorney's fee.[12] For this transaction, Lizama did not advise Teresita to seek the advice of another counsel before selling her short-exchange expectancy.

The $20,000 paid for the purchase of Teresita and Margarita's expectancies came from the account of KST Corporation, a corporation wholly owned by Lizama's employee, Toshiko Yoshimura,

---

[12] This fee was for the work to be done in clearing the insurer's concern about the Pangelinan/Tudela exchange and for including Lot E.A. 112 in Tudela's estate.

374

and her husband. This corporation was formed by Lizama, who was one of the incorporators and was listed as secretary/treasurer.

After Lizama had corrected the title defects by having Teresita's ownership of Lot E.A. 112"A" confirmed and approved by the trial court in the probate of Tudela's estate, and by discovering the District Court decision which had validated and approved the Pangelinan/ Tudela exchange, Teresita's sale to Wabol was consummated and Mr. Novo-Gradac delivered a check for $56,325 to Lizama.

Lizama and Teresita went to the bank where Teresita endorsed the check. Lizama kept $10,000, $1,000 for his fee in representing Teresita in the Wabol sales transaction[13] and placed the remaining $9,000 in a trust account entitled "Lizama, Juan ATF Camacho, Teresita T." According to Lizama, he deposited the money in the trust account because Teresita suddenly changed her mind and decided not to return the $10,000 to Lizama's mother. Contrary to his understanding, she, at that point, wanted to keep the $10,000. (Tr. at 304) Lizama wanted to give her time to think about whether to return the money or keep it.[14] However, after a certain period of time, if she failed to inform him that she opted to keep the

---

[13] Although the trial court found that the $1,000 was for Lizama's representation of Teresita in the Wabol sale, the record does not show what legal work Lizama performed in connection with that representation. However, Lizama testified that when he kept the $1,000, he thought he had not been previously paid by Teresita. (Tr. at 205) In fact, he was previously paid $1,000 by Margarita, on behalf of Teresita.

[14] Instead of giving Teresita the money, or returning it to his mother, he decided to place it in the trust account.

$10,000, and he had to file suit against MPLC regarding the short-exchange claim, then he would have to close the account and give the money to his mother. (Tr. at 250) According to Teresita, she did not agree with what Lizama was doing and thought that the money was hers and would receive notice before it would be taken out of the account. (Tr. at 44-46)

On April 17, 1989, Lizama paid Toshiko Yoshimura $30,000.00, part of which was to reimburse KST Corporation for the $10,000 used to purchase Teresita's short-exchange land. After paying off KST Corporation, Lizama then closed out the trust account on May 23, 1989, and transferred the $9,073.22 in that account to his personal account, without Teresita's knowledge or consent, and without re-conveying to Teresita, her interest in the short-exchange claim.

In November, 1989, Teresita returned to Saipan and asked Lizama for the $9,000 placed in the trust account. Lizama refused, claiming that Teresita had opted to take back her interest in the short-exchange claim. Therefore, the money belonged to him since he had paid off KST Corporation. At the same time, however, the interest in the short-exchange claim remained in Lizama's mother's name and had not been re-conveyed to Teresita.

Thereafter, Teresita filed a complaint with the Bar Association and the disciplinary committee advised Lizama to return the money to Teresita. Lizama returned the money. The complaint brought by Teresita proceeded to trial.

# III.

Lizama contends that the factual findings of the trial court, with respect to each of the violations found, are not supported by clear and convincing evidence, as required by Rule 9(g) of the Disciplinary Rules and Procedures, and constitute reversible error.

The disciplinary counsel contends that the findings are substantially supported by clear and convincing evidence, pointing out the evidences in the record that support each of the findings. We agree.

When the burden of proof at the trial court is that of clear and convincing evidence, and the assigned error is that the evidence do not support the trial court's findings of fact, the standard of review is whether the findings are supported by competent and substantial evidence. See In re Estate of Manuel F. Aldan, No. 90-045 (N.M.I. March 6, 1991). This is a question of law. 5 Am.Jur 2d Appeal and Error, § 831 (1962). We review questions of law de novo. In re Adoption of Amanda C. Magofna, No. 90-012, 1 N.Mar.I. 172 (1990).

Here, there are conflicting evidence. However, we accord particular weight to the trial judge's assessment of conflicting and ambiguous evidence. And, when a trial court's finding is supported by substantial evidence, it should not be disturbed on appeal. In re Estate of Lorenzo Rofag, No. 89-019 (N.M.I. Feb. 22, 1991). Upon careful review of the record, we conclude that the findings of the trial court are supported by competent and

substantial evidence.[15]

## IV.

The trial court found Lizama to have violated Rule 1.15 by co-mingling his client's fund with his own personal fund without the client's knowledge and consent. Lizama contends that as a matter of law, the trial court committed an error by reaching that conclusion.

This issue raises a question of law which we review <u>de novo</u>. <u>Dilutaoch v. C & S Concrete Block Products</u>, No. 90-016 (N.M.I. Feb. 1, 1991). In applying that standard of review, it is our opinion that the trial court did not commit an error of law.

First, the $9,000 placed in the trust account was done in order to safeguard the client's money. Second, the money was taken out of the trust account and the account was closed without the knowledge and consent of the client. Third, the money taken out from the client's trust account was then deposited in Lizama's own personal account without the client's knowledge and consent.

Since Teresita was Lizama's client, it is clear that he co-mingled his client's money with his own. Therefore, the trial court did not commit an error of law. We affirm as to the violation of this rule.

---

[15] We affirm the finding of the trial court that there existed an attorney/client relationship between Lizama and Teresita starting when Lizama agreed to assist in removing the title defects.

## V.

The trial court found Lizama to have violated Rule 1.7(a) and 2.2 by simultaneously representing himself, Teresita, and his mother when they had conflicting interests. Lizama contends that this conclusion by the trial court constitutes an error of law. We apply the de novo standard of review. Dilutaoch, supra.

When Lizama agreed to help Teresita in removing the two defects upon her title to Lot E.A. 112"A", she became his client. At the time that Teresita offered to sell the land to him, she was still his client.

Lizama then arranged for his mother to purchase the short-exchange claim from Teresita and prepared the documents for Teresita's signature, transferring the claim to his mother. At that point, he was using his mother's name to purchase the claim himself.

Subsequently, he re-paid KST Corporation the $10,000 and claimed that the money in the trust account became his money. The trial court correctly concluded based on these facts that Lizama was the real purchaser of the land but used his mother's name to make the purchase.

The trial court's analysis is consistent with the principle that the one who advances the money (unless the money is a gift or a loan) becomes the purchaser of the land. See, Aldan-Pierce v. Mafnas, No. 89-003 (N.M.I. July 5, 1991).

However, since the trial court found that Lizama used his mother's name as a sham, its conclusion that Lizama was

379

representing his mother and Teresita simultaneously was inconsistent and incorrect. Either Lizama represented his mother (acted on her behalf) or used her name (acted for himself), but not both.

Therefore, we conclude that Lizama did not violate Rule 1.7(a) and that the trial court made an error of law as to the violation of this rule. In order to violate Rule 1.7(a), the attorney must be representing more than one client at the same time. We reverse as to the this violation.

We note, also, that Lizama did not engage in any negotiations regarding the terms of the transaction on behalf of either Teresita or his mother. He did not act for his mother, but only used her name. Teresita made a definite offer to sell her land for $10,000 and the offer was accepted as is. Lizama did not act as an "intermediary" between Teresita and his mother. For this reason, we conclude that Lizama did not violate Rule 2.2 and we reverse as to the violation of that rule.

## VI.

The next issue raised by Lizama is whether the trial court made an error of law by concluding that Lizama violated Rule 1.8(a) by entering into a business transaction with a client, without clearly explaining the nature of the transaction and without advising the client to seek the advice of an independent counsel. This is a question of law which we review de novo.

The trial court, having found that Lizama was the person who

purchased the land through his mother, while Teresita was his client, was correct in concluding that Lizama entered into a business transaction with his client. We, therefore, affirm as to this violation, but note the following mitigating factors.

1. It was Teresita who initiated the offer to sell her land to Lizama. Lizama rejected the offer but was moved to do something when the client (his aunt) started crying in front of him, begging for help.

2. The nature of the transaction was clear and simple. Teresita offered to sell her interest in the short-exchange claim for $10,000 and the offer was accepted.

3. Since Teresita was in a predicament and needed the money immediately to return to Nevada, she did not care who was buying the land, how, and where the money was coming from, as long as she got paid.

These factors should be considered in imposing sanction.

## VII.

▪ Lizama next contends that the trial court committed an error of law by concluding that Lizama violated Rule 1.8(e) in providing financial assistance to a client in connection with a pending or contemplated litigation. This is an issue of law which we review <u>de</u> <u>novo</u>.

 We agree. The payment of $10,000 to Teresita was solely for the purchase of her interest in the short-exchange claim. That transaction was not made in connection with either the case

subsequently filed against MPLC or the pending probate of the estate of Tudela. Teresita was desperate for money and was anxious to sell her expectancy, not because of any pending or contemplated case, but simply to get back to Nevada. Teresita was not a client of Lizama in either the probate case or the case against MLPC. The only client in both cases was the administratrix, Inocencia.

Therefore, we conclude that the trial court made an error of law and we reverse its decision as to the violation of this rule.

## VIII.

Lizama contends that the trial court made an error of law by concluding that Lizama violated Rule 1.8(f) by receiving fees from his client (administratrix) and a third person (Teresita) in the probate case. This is an issue of law which we review de novo.

We agree with Lizama partially. Although the trial court correctly found that Teresita was Lizama's client, it failed to identify the precise legal work for which Teresita hired Lizama and paid the first $1,000 (through Margarita) in his office.

Teresita hired Lizama to eliminate the two defects raised by the title insurance company. The first defect, involving the Tudela/Pangelinan exchange, had no relationship with the Tudela probate and was resolved simply by legal research. That legal work was properly paid out of the $1,000, but only part thereof. The other part of the $1,000 was to pay for correcting the second defect.

As to the second defect, Lizama had learned that the title to

382

the land (land to be sold to Wabol) had been transferred from Tudela's estate to Teresita by the mutual deed of conveyance. However, to correct the title defect raised by the insurance company, he had to include that land in the estate of Tudela for the court to confirm and approve the prior distribution. Since Inocencia was already paying for that work, Lizama's acceptance of additional fee from Teresita was impermissible. However, the record on appeal does not show what portion of the $1,000 should be applied towards correcting the first defect, and how much should be applied towards amending the inventory of the estate of Tudela. Therefore, we shall remand as to this issue for determination by the trial court.

As to the second $1,000 fee paid by Teresita at the bank, the trial court is correct that such money should be returned to Teresita. There is nothing in the record that explains what exactly that fee was being paid for. The trial court states in its decision that the "$1,000 was for additional attorney's fee in processing the Wabol sale . . . ." (Emphasis added) We interpret that to mean that the fee is paid for removing the title defects in order to facilitate the Wabol sale. However, Teresita already paid $1,000 for that through Margarita.

Therefore, we conclude that as to the first $1,000 paid by Teresita, the trial court erred (only as to that undetermined amount that would be applied to correct the first defect) as a matter of law and we reverse. As to the second $1,000 paid, the trial court is correct and we affirm.

## IX.

Aside from the above issues (directly related to the violations found by the trial court), Lizama also contends that the trial court erred by excluding certain evidence. He asserts that the evidence excluded consisted of oral testimony and respondent's exhibit "C". According to him, the oral testimony would have established that Lizama's mother had also received financial help from her other children and that the $10,000.00 paid to Margarita Riva for her short-exchange claim was paid by another sibling of Juan Lizama.[16]

This is a matter within the discretion of the trial court and we review exclusion of evidence for an abuse of discretion. In Re the Estate of Mueillemar, No. 90-020 (N.M.I. Nov. 29, 1990).

Lizama argues that had the court admitted the evidence, it would not have found that Lizama used his mother's name as a sham in the purchase of Teresita's expectancy. We disagree. If the allegedly excluded evidence directly and overwhelmingly contradict and negate all the evidence which support the court's finding, Lizama might be able to show that there has been an abuse of discretion. However, the fact that other children helped Lizama's mother financially does not negate or refute Lizama's use of his mother's name to purchase the land expectancy in this matter. Furthermore, there is competent and substantial evidence in the record which support the court's finding. Therefore, we conclude

---

[16] Lizama did testify (and his testimony was not excluded) that his brother paid back the $10,000 used to purchase Margarita's expectancy. (Tr. at 257)

384

that the trial court did not abuse its discretion.

## X.

Finally, Lizama raises the issue of whether the disciplinary committee violated his right to due process of law since Charles Novo-Gradac, who represented Wabol in the purchase of Teresita's Papago land, also participated in the committee's deliberation and decision. He equates the disciplinary committee to that of a grand jury, and argues that since a grand jury cannot function as a judge for the same person they have indicted, neither can the disciplinary committee sit in judgment over an attorney whom they have investigated. Also, that Novo-Gradac was a witness and thus, could not be a judge in the same case.

For the reasons set forth below, we conclude that Lizama has not been denied his right to due process of law.

Unlike a grand jury indictment, the disciplinary committee does not indict an attorney. Even if the committee decides not to prosecute, the court, independently, may order further investigation and prosecution. Thus, the committee is not an adjudicator but functions as a filter for unfounded disciplinary complaints. Novo-Gradac did not act as a judge in the committee's deliberations.

Lizama, after the court appointed disciplinary counsel, was served with a summons and complaint. He answered the complaint and was present at trial with counsel. He presented evidence on his behalf and cross-examined adverse witnesses. The findings and

385

conclusions of the disciplinary committee were not introduced at the trial. Therefore, he had a full-blown trial _de novo_.

Furthermore, Lizama did not raise any objection before the trial court regarding Mr. Novo-Gradac's participation in the decision of the committee. Nor did he raise any objection, at the ·disciplinary committee level, regarding Mr. Novo-Gradac's participation.

## XI.

At the outset, we set forth the disciplinary sanctions imposed by the trial court as a result of its conclusions re violations committed by Lizama. Having reversed some of those conclusions, we shall remand this case to the Superior Court for a re-sanctioning consistent with our ruling herein.[17]

The decision of the Superior Court is hereby **AFFIRMED** as to the violations of Rules 1.15, 1.8(a), and 1.8(f), only as to the second $1,000 paid to Lizama as additional fee; **REVERSED** as to Rules 1.7(a), 2.2, 1.8(e), 1.8(f), only as to the first $1,000 fee paid through Margarita to clear the two defects,[18] Part B of the sanction (amount to be determined upon remand) and Part C of the

---

[17] During the trial, Ms. Mack attempted to introduce evidence which would show that Lizama mishandled _other_ clients' money. The trial court correctly excluded all such evidence as irrelevant. Thus, we find no factual basis for the court's order to audit Lizama's trust account for the last three years. This does not mean that the court is not empowered to do so, only that it has failed to state any legitimate purpose it would serve.

[18] Only as to the undetermined amount that should be applied towards correcting the first defect. On remand, the trial court shall make that determination.

386

sanction; and **REMANDED** for further proceedings to reconsider disciplinary sanctions, consistent with this opinion.

Dated this ___16th___ day of ___December___, 1991.

_____
JOSE S. DELA CRUZ, Chief Justice

_____
RAMON G. VILLAGOMEZ, Associate Justice

_____
JESUS C. BORJA, Associate Justice